and DAC Fibers, 2009-1021. Mr. House, talking about terephthalic acid. Correct, Your Honor. May it please the Court. Michael House on behalf of Appellate Huvis Corporation. This case presents a question of an agency's sudden abandonment of a long and established consistent practice on the testing of the value of inputs and outputs procured by the producer from an affiliated party. But the Court of International Trade sent it back on that issue and they were satisfied with the answer, which seems to have been well. We learned new techniques to give us sharper information and so they affirmed. Correct, Your Honor. The lower court did send it back on remand and the agency came back with an explanation. We submit that the explanation the agency proffered was inadequate. And the reasons for that are two. One is that in the government's response brief, in a nutshell, the government summarized what the agency's reasons were as making a factual finding that prevented it from using the methodology that it had consistently used in every prior proceeding. And number two, its view that the methodology, the new one, would improve accuracy. We submit that the agency was wrong on both counts. Do they have to do that? I mean, reading FCC more recently and precedent before that, if the government comes in and just makes some sort of showing that the new data is accurate or reasonably accurate or not arbitrary, isn't that all that is required, even if we agree that there was a prior past practice? We submit that the FOX FCC decision doesn't change the way the court should look at this. The agency needs to provide an adequate explanation. The Supreme Court's decision in the FCC case simply held that the agency doesn't have to provide an enhanced description of its... An adequate explanation as to what? As to why it needed to change it or that the new computation that they're doing is not arbitrary or reasonable or whatever? We believe, Your Honor, that the cases support the principle that the agency has to adequately explain the reasons for its departure from an established practice. And that explanation must be adequate under the cases. But are you also raising the second point that Judge Prost raised? We believe that the explanation that the agency gave as the new methodology being more accurate is not supported by substantial evidence on this record. Do they have to show that it's more accurate under FCC or do they just have to show that it's accurate? Or reasonably accurate. We believe that the FCC case fairly read holds that the agency must show that there is a rational reason for changing its practice. That may be, in the words of the Supreme Court in FCC, that the agency believed the practice to be more accurate. But we believe that the record in this case shows that the reason proffered, that is, greater accuracy, is not supported by the evidence in the record here. If I understand your argument correctly, let me see if I can flesh this out a little bit, is that the statute says you can use market price or market prices. It seems to be talking about actual market prices or in lieu of that cost. And the question is whether taking cost plus profit is an accurate way of arriving at a market price where the actual market price is not available. Is your argument that taking cost plus profit is not a reasonable surrogate for market price? Our position, Your Honor, in this case is that the cost plus profit methodology that the agency applied for the first time in this proceeding did not result in an accurate calculation of a surrogate market value. And the reason for that in this case, on the facts of this case, is that when you look at the verified evidence of the value and physical properties of the three different inputs in question, the methodology employed by the agency of using a financial statement for an entire company covering many, many products in addition to the specific input in question as a basis to add the profit on top of the cost of production, that methodology in this case on its facts yielded a surrogate market value benchmark that is inaccurate. Sorry. So you agree that they can try to arrive at a surrogate market price using facts available? Well, we don't agree that the reasons proffered by the agency... No, no, no, no, just in general. In general, the statute says market price. There's a facts available provision. If the actual market price isn't available, there are no actual sales. You agree that commerce has the power to arrive at a surrogate market price? We don't... I'm not asking whether they did it lawfully in this case, but just in general they can do that. Commerce has broad discretion to incorporate the statute, yes, Your Honor. Yes, they can do that. So your argument is that while they can do it in general, in this case using cost plus overall profit is not a reasonable or non-arbitrary way of doing that? Well, I believe our argument goes beyond that, Your Honor. The Commerce Department has never used this methodology in these cases, never, in either in this proceeding and all the previous reviews. Well, I'm not impressed by the argument that they couldn't change their methodology. I think they could change their methodology. The question is whether the changed methodology survives an arbitrary and capricious standard. Well, we believe that the standard of review here is whether the new methodology is supported by substantial evidence on this record. And we submit that it's not because the new methodology results in a surrogate market value that is higher than what is undisputed to be the highest value market input, the other kind of terephthalic acid. It's undisputed, the purified TPA. That's the problem that I had with the briefs, and if I start getting into the confidential stuff, please stop me. But I don't think I will. It seemed to me the only thing you pointed to in your briefs that was problematic in terms of the point that Judge Dyke raised was that you look at the bottom line and a cheaper product is valued more highly than a less cheap product. But I didn't see any articulation. I mean, I think arguably you would have a case if there was something suspect about using this profit margin. If this profit margin were based on 14,000 other products and all this other types of stuff, then it would arguably not be an appropriate surrogate. But I didn't see you really making or pressing that argument here. Well, Your Honor, the profit margin used by the agency, it's undisputed in the record, was the overall profit margin of the supplier company. And it's also undisputed that that supplier company, as the financial statement shows in the record, produces and sells far more than the one particular input in question here. But the basic problem is your supplier isn't producing the information. So Commerce has to go to facts available. But we concede, Your Honor, that this supplier refused to supply the market value information that would be relevant. The supplier is not controlled by Huvis, our client, and we have no power to compel the supplier to provide that information. That is the situation that has been the case in this proceeding since the very beginning in every review up to this one. So this is not a new situation for the agency. Well, we're in the record, and the government points to two pages in the record that arguably deal with the accuracy or inaccuracy of the use of this profit margin. That's on 182 and 202. What can you show us in the record that will establish to us that the use of it was arbitrary, the use of this profit margin, because it was an inaccurate number, given all the products they're producing or whatever? Well, Your Honor, we don't argue that the profit margin, the ratio, the percentage calculated was inaccurate in and of itself. It came from the financial statement. No, no, no, not that it was inaccurate with respect to the company, but just that it was not reasonable to use that number for your product. The basis for our position that it was unreasonable to use it for this input is the verified information that the particular input here, this QTA, qualified terephthalic acid, is the least valuable, the least quality, the lowest quality of the three different terephthalic acids. Is that your only argument? Your Honor, we think that it is quite clear from this record that the verified information That's your only argument. I understand what the argument is. Is that your only argument as to why profit plus cost is not a good surrogate for market price here? It is. In this case, Your Honor, the outcome is a price that is unreasonable and unsupportable on the record. As you said, Your Honor, we're not arguing that the Commerce Department is prohibited in any case from using a cost plus profit margin. But you might be arguing, as Judge Prost has asked you, that a gross profit margin across all products of the company is not a good profit margin to use with respect to this one individual product. What I'm trying to get at is what's your argument as to what's wrong with the government's methodology? You've identified one thing, which you say the price of this one product, based on the constructed approach, is out of whack with another product. But apart from that, what are you saying? Well, Your Honor, that's the outcome of the approach being unreasonable. The price is out of whack. As you say, it's not consistent with the verified information about the relative value of these products. And that verified information relates to the value of the three inputs, so it's not just the physical characteristics of them. The record contains that information. The argument about the profit margin, it's undisputed, we believe, that this profit margin is not a profit margin that reflects the production of QTA, Qualified Terephthalic Acid, the input in question. The profit margin used, it's undisputed, was a profit margin for the supplier company as a whole. That may or may not be accurate in terms of reflecting correctly the profit on this particular input. And therefore, we submit in this case when you look at... Well, is there anything in the record you can point... How do we even know whether there's something that they produce something other than QTA? I mean, what is there in the record to call into question? Or how much of it is QTA and how much of it is something else? Well, Your Honor, I'll have to defer to our brief, but we cite to the Commerce Department's analysis in using the profit margin in the joint appendix at 254, 260, 282, 291, and 306. Some of those citations are to the verification report of the company, but we believe that we cited to the financial statement of the supplier company as well. If you're willing to your rebuttal time, you can continue or save it as you wish. If there are no other questions now, Your Honor, I will save it for rebuttal. Mr. Tresini. May it please the Court. HUBIS has conceded that the Department of Commerce possesses the authority to construct a market price in its major input rule analysis. But it is kind of odd, isn't it, to construct a market price by taking cost plus profit when the alternative under the statute is cost? You would have thought maybe that if Congress wanted cost plus profit to be an alternative, they might have mentioned it instead of cost being an alternative. Well, the Congress was silent concerning exactly how to derive these values. And, in fact, what the Congress wanted was for major inputs to reflect what the cost would be between unaffiliated parties in arm's-length transactions. And in this case, there's really no doubt that the supplier, if you look at the— I don't think you're answering my question. My question is, you've got Congress's market price. You can't determine the actual transaction value between unaffiliated companies used market price or in lieu of that cost. And my question to you is if they wanted you to use cost plus profit, don't you think maybe they would have said that? Congress might have said that, but they left the statute ambiguous by allowing the Department of Commerce to use the maximum of market price, cost of production, and transfer price. And, in fact, there are cases, say if a company is not profitable at all, where the transfer price might be at the cost of production or the market price might be below the cost of production for that matter. So the Congress wasn't only looking at cases where sales of intermediate inputs were profitable. In your brief, you say that the profit margin taken from the financial statements is reasonably related to the production of these major inputs. This is the point we were asking before about the profit margin and whether it's related. And then you cite to two pages in the appendix, and I don't understand how either of those support the statement that there's a reasonable relationship between the production. Well, we cite it to pages 182 and pages 282 of the appendix. 202. I mean 202, pardon me. And they are both non-confidential documents. They're fully reproduced in the non-confidential appendix and stamped non-confidential as well. First, starting with page 202, it talks about the general information of the supplier. And it states, its factory is located, names the location, and produces terephthalic acid. And then it also notes the production of one other product, QTA, where the supplier built a new plant for the production of QTA. Those are the only products mentioned in the general information of the company. Likewise, if you go back to page 182. So that proves what? That proves that the profit margin for both of those products is necessarily reasonably related to the profit margin of one of the two? Under the Department of Commerce's Facts Available Authority, yes, that's permissible. Commerce found there were three different grades of terephthalic acid. And the producer, that's all the producer produced was terephthalic acid. Likewise, if you look at page 182, it talks about a large percentage of its sales were with affiliated parties. So, in fact, really this particular company, the supplier, was closely related to and integrated with its related companies. And its whole purpose was for the production of various forms of TPA, of terephthalic acid. How do we know that? We know that from this information on the record in the Department of Commerce's determination that the profit value was reasonably related to the production of this major input. And that's the standard is that it just needs to be reasonable. Well, do you agree that the average price of MTA calculated over a course of the review period was greater than the average price of QTA?  Isn't that a problem? We also noted that it's, is it a problem? I mean, doesn't it call into question the numbers you're using, given that I didn't think there was a dispute that it was the reverse in terms of your value? Well, there were two months out of the period where it went the other way. So purity alone is not necessarily the dispositive factor. So the record evidence here, although it doesn't fit neatly into every, doesn't fit exactly into what might be a perfect, into a perfect rubric of one product always being more expensive than another and a third input being more expensive than the other two, the standard here is reasonableness under the agency's facts available authority. So why was it reasonable to do this when the, this product usually has a lower price? It was reasonable to do this because the supplier itself earned profits on the manufacture of the subject major inputs. And therefore, to have a reasonable market price, which would be the cost of producing the merchandise plus the profit earned on the merchandise, the Department of Commerce exercised its gap-filling authority in this case and did it in a completely neutral manner. Is it your view of the law that you have to prove it's more accurate? What is your view of what you have to show in terms of, let's assume, I know you just continue to dispute it, but let's assume we all conclude that there was a departure from prior practice. What is your view of what you have to then come up with? Well, under the Fox versus FCC case, what you need to do is support your determination with reasoning, just like any other administrative determination. All, the only thing that might be different with respect to a change in practice would be that you have to acknowledge that you had a practice before and note that the agency needs to note that it believes that its new determination somehow is, well, the words used by the Fox Court were better, but in this case, more accurate than the previous way of doing things. Do you think you have to show that it's better or just that it's also reasonable? You just have to show that it's reasonable when the case is being reviewed. There's no higher standard that needs to be met, and that was made very, very clear in the Fox case. Going back to the point that I think Judge Dyke asked at the outset, which is that there are these three criteria that you're supposed to consider, transfer price, market price, and cost of production. And I guess you can get away with not considering one of those if it's just not available and everybody agrees it's not available. But doesn't what you're using now in terms of the market price being cost of production plus or cost of production minus, if it's a loss rather than a profit, doesn't that entirely eliminate the use of the factor cost of production? Well, no, because cost of production is used in determining a market price, so that analysis is still going to be— But not as a separate factor. Congress said these are three separate factors that you compare, not that you use cost of production— I mean, cost of production, you're saying, cost of production for profits and losses equal market value, and so that's how we're considering cost of production as a factor? Yes, and that can be a problem, but likewise, Congress never said, well, go ahead and discard one of those factors if it's not right there handed to you on the administrative record. Congress never said to do that. I think what Judge Prost is asking you is, aren't you effectively discarding one of these factors? Congress contemplates that in some circumstances you'll use cost of production. Under the new rule, it seems as though you're never going to use cost of production because it'll either be cost of production plus or minus profit. Isn't that correct? Well, if it's cost of production minus profit, then you will use cost of production. Say cost of production is higher than transfer price and higher than cost of production minus profit, then you'd use cost of production as your major input value. So you would use it under those circumstances. The question is whether if you're not provided with a market price, the Department of Commerce is not provided with a market price, does the agency have to pretend that one doesn't exist, especially where that merchandise is sold on the open market in the producing company? And there's no basis in the statute. No, but what I think the argument is here is that there's a better way of getting to the market price for the product in question here, and that's to use the market price for a closely related product, which I guess is MTA, right? And that's what in the past Commerce did. That's correct, and that was essentially the Department of Commerce exercising its facts available authority also to fill the gap for the missing market price. So what they're saying is it's not reasonable to do it with the cost plus profit when you have available to you a better surrogate for the market price, which is the market price of MTA. That's their argument, right? Well, that's not the plaintiff's argument. The plaintiff's argued before the Department of Commerce not to use the market price of MTA as a proxy for QTA. What the plaintiff's wanted was the Department of Commerce to pretend that there could be no market price for the surrogate. But here their argument is that it's not reasonable for you to use cost plus profit when you have this other alternative of using MTA, an actual market price, as a surrogate, right? That's what their argument is here, in part. We don't believe that that was their argument unless they— Well, let's hypothetically assume that it is their argument, okay? There's record information that the Department of Commerce verified to the effect that QTA is not a viable surrogate for MTA because there's no indication that those two inputs are actually interchangeable in the manufacturing process. And that was record information that was provided by HUVIS when it asked Commerce not to construct a value in that manner. That was the only ground, that they're not interchangeable in the manufacturing process? I mean, it would seem to me that if one product generally has a lower price than the other one, that you would be suspicious of a surrogate price that ends up being higher. Yes, but there might be other factors that go into the consideration. And in this case, the substantial evidence on the record— substantial record evidence shows that the supplier produced various grades of terephthalic acid and that its gross profit margin on all of those grades was greater than the transfer price, which would indicate that, on average, the market price— the price that that supplier transferred similar merchandise to unaffiliated buyers was going to be higher. So the Department of Commerce simply exercised its fax-available authority to fill in the gap in the record because the agency knew there was a market price. And in fact, there's— I'm not sure that I understand that reasoning. Well— You've got a gross profit margin, which, assuming this company is limited to producing this acid, you don't know which amount of profit goes to which product. So what you're using is sort of a gross measure. You're assuming that you're going to construct a market price using the average profit, right? That's correct. So why is it that that approach to it is more accurate than the approach you used in the past of using the market price for the surrogate product? Because at least you are using the cost of production of the actual product and then adding an amount for profit. So you are more closely linked to the production of the major input itself. Likewise, I just wish to add that— The problem is you're not linked to the actual product when you use the profit figure because it's an average profit figure. Correct, and that's under the agency's fax-available authority. Those were the facts on the administrative record. And so the question then becomes, was it permissible? Was the use of that profit value supported by substantial evidence? Whenever the Department of Commerce exercises its gap-filling authority, you're not going to get exact values for the merchandise in question or for the variable in question. The problem I have, though, is that on this record, at least what you've pointed us to, it's not clear what kind of discrepancy. There's an enormous discrepancy or a minor discrepancy between the use of this product margin for this particular product. I don't know how we are supposed to sort of figure that out. Well, it's entirely permissible because this is what the Department of Commerce does when it constructs a value all the time. It uses the company's profit, even if the company manufactures a number of other profits. So it's a permissible methodology for the agency to calculate a value based upon the record evidence before it. But you would agree, would you not, that there are circumstances in which that profit margin, if we knew the record, would be wildly inaccurate. If you only produce 5% of this particular product and the profit margin is reflective of 95% of which is dealing with different products, then you wouldn't be using the profit margin. That wouldn't be reasonable, would it? Under a circumstance like that, sure. But remember, it's also the respondent's burden to create an accurate record before the agency. And the plaintiff here, Hoovis, never raised this argument before the Court of International Trade or before the agency concerning the representativeness of the profit margin. Their primary argument, their primary thrust was that what the Department of Commerce did was an impermissible change of agency practice, which we believe is not true under this Court's precedence as well as the Fox case. Thank you, Mr. Sassini. Mr. House, we have a little rebuttal time. Thank you, Your Honor. I would briefly say that first in the Fox FCC case, the Supreme Court made it clear that the agency, in departing from an established practice and changing its policy, has to enunciate good reasons for the new policy. That's very clear from the Court's opinion. And we submit that here there are not good reasons. That is, the methodology chosen for the first time doesn't bear a rational connection between that method and the facts on the record in this case. And we cite to the Supreme Court cases requiring a rational connection. The methodology employed by the agency for the first time here does, as we did argue in our reply brief in this case, effectively nullify the use of the COP in this case. When you have COP as one of the benchmarks, which the Commerce Department has consistently used in each of the previous reviews, and then suddenly decides to use COP plus a markup for profit as a... But it doesn't eliminate COP, as Mr. DeSini pointed out. If there's a loss here rather than a profit, then you do rely on COP. So they retain that third factor. Well, Your Honor, we haven't seen any representation by the government that commerce would deduct a loss from COP in doing the benchmarking. What it means for a company that has a negative profit margin is that the COP is the floor. That is, it will never be less than COP. It may well be more when there's profit. But in our view, then, as we argued in the reply brief, it renders the COP as a benchmark essentially out of the picture when the question is how much above COP is the comparison marked up COP plus profit. But ultimately, the essence of our argument before the court is the inaccuracy of the methodology used on the record of this case. We want to stress that here the three types of terephthalic acid are verified as being quite different in quality and quite different in value. The profit margin used in this surrogate market price was an average of all of them. that the supplier company indisputably produced. And that resulted in an inaccurate market value in the end. Thank you, Mr. House. We'll take the case to under-regardment.